# EXHIBIT 3

From:DAVIDSON & GRANNUM LLP    18453659190        11/09/2007 12:33 #090 P.005/024

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| BARBARA R. KAPLAN | ) | |
| | ) | |
| Plaintiff | ) | 2007L012411 |
| | ) | CALENDAR/ROOM B |
| v. | ) No. | TIME 00:00 |
| | ) | Legal Malpractice |
| DAVIDSON & GRANNUM, LLP, | ) | |
| SANDRA D. GRANNUM & DAVID L. BECKER | ) | |
| | ) | |
| Defendants. | ) | |

### VERIFIED COMPLAINT AT LAW

NOW COMES the Plaintiff, Barbara R. Kaplan, (hereinafter "Kaplan"), an individual of the City of Chicago and State of Illinois, by her attorney, Gregg Rzepczynski, (hereinafter "Rzepczynski"), brings forth this Verified Complaint at Law against the Defendants, Davidson & Grannum LLP, (hereinafter "D&G"), a limited liability partnership, located in the States of New York and New Jersey; Sandra D. Grannum, (hereinafter "Grannum"), an individual of the State of New York and David L. Becker, (hereinafter "Becker"), an individual of the State of New York and in support thereof states as follows:

### FACTUAL BACKGROUND

1. Kaplan is a Registered Representative in the securities business and has been for more than thirty-five (35) years working for several major Wall Street powerhouse firms, all Members of the New York Stock Exchange, (hereinafter "NYSE"), including Drexel Burnham, Bear Stearns, UBS, CIBC Oppenheimer, (hereinafter "CIBC"), and Morgan Stanley, (hereinafter "Morgan").

EXHIBIT 3

From:DAVIDSON & GRANNUM LLP        18453659190            11/09/2007 12:33 #090 P.006/024

2. At Bear Stearns, Kaplan was Senior Managing Director for fourteen (14) years, at UBS she was Senior Vice-President for ten (10) years and at Morgan she was Senior Vice-President for four (4) years and member of the special and exclusive Chairman's Club.

3. Kaplan's gross commissions in 2002 were in excess of three million dollars, ($3,000,000.00), at Morgan and she was among the top twelve (12) producers in Private Client Services. She was respected and highly successful in the provincial LaSalle Street community of stock brokers in Chicago.

### THE 212 INVESTMENT GROUP MATTERS

4. Kaplan contacted Becker in January 2005 and asked him to refer a securities attorney who was licensed in New York State to defend her in the Supreme Court of the State of New York, County of New York in an action entitled <u>212 Investment et al. v Myron Kaplan, Barbara Kaplan et al.</u>, Supreme Court of the State of New York, County of New York, Index Number 603029/04, (hereinafter the "212 Supreme Court Case").

5. In the 212 Supreme Court Case, Kaplan was accused of facilitating the allocation of favorable trades for an account of her brother's rather than for the hedge fund managed by her brother. The allegations of wrongdoing were alleged to have occurred for a number of years, including the period November 1998 through April 1999, when Kaplan was employed as a Senior Vice-President at CIBC.

6. At the time Kaplan was at CIBC, Becker was employed by CIBC as Head of Lawyers and First Assistant to the General Counsel, Mark E. Kaplan (no relation).

7. In fact, while Kaplan and Becker were both employed by CIBC, Becker investigated and reported Kaplan to the NYSE Regulatory Division, for the very same allegations which were part of the 212 Supreme Court Case.

8. In fact, after conducting an internal investigation, it was Becker, positioned at CIBC who filed a NYSE Form RE-3 with the Regulatory Department of the NYSE against Kaplan in May 1999.

9. In order to become a stock broker, one must apply to a Broker-Dealer firm that is a member of the National Association of Securities Dealers, (hereinafter "NASD"). The applicant then submits a Form U-4 with the NASD that must be absolutely clean in order to be accepted by the NASD. Once the U-4 is approved, the applicant sponsored by a NASD firm, takes a Series Seven (7) examination among various other tests in order to qualify to become a registered representative. The broker first must get licensed in their home state and only after that may apply to any/all of the remaining forty-nine (49) states for additional licenses. A "Ding" or "Mark" on a Form U-4 can prevent any brokerage firm or State agency (acting sovereignly) in denying a license. The NYSE Form RE-3 is filed by a NYSE member firm with the NYSE Regulatory Division. It charges the registered representative with regulatory wrongdoing and rule-breaking. This charge is then added to the broker's U-4 license and the U-4 is now "Marked." It is almost impossible to reverse the regulatory charges brought by the NYSE firm. The RE-3 Form invariably results in the broker being investigated, deposed, barred, suspended, fined, and destroys their career and reputation. "Heightened Supervision" is the dire consequence of a "Mark". The broker subsequently becomes "red flagged" for their remaining entire business life.

10. Incredibly, Becker was the person who filed the NYSE Form RE-3 against Kaplan incriminating Kaplan, then a NYSE Registered Representative at CIBC.

11. Subsequently, Kaplan discovered that the NYSE RE-3 Form covered only eleven (11) days of trading in April 1999. NYSE member firms do not often file Form RE-3 filings

From:DAVIDSON & GRANNUM LLP     18453659190     11/09/2007 12:34 #090 P.008/024

because they result in triggering a NYSE investigation onto themselves. CIBC was subsequently fined; Kaplan's Branch Manager, Carl Chaleff and CIBC Sales Manager, Thomas Evans, were suspended and fined. Becker was reckless, destructive and dishonest. Becker himself was terminated from CIBC soon thereafter.

12. This extraordinary filing NYSE Form RE-3 resulted in a NYSE inquiry and investigation (Case #HPD 03-115) and finally two (2) civil cases, first, the 212 Supreme Court Case and the second, a related arbitration. Becker caused Kaplan's career to end forever with the elite members of the NYSE after more then thirty (30) successful unblemished years of work in the securities industry. This was a lifetime sentence against Kaplan.

13. Instead of disclosing his obvious conflict of interest to Kaplan properly and truthfully by refusing to get involved with the 212 Supreme Court Case, Becker picked himself and his then firm, D&G to represent Kaplan.

14. Becker told Kaplan that he was the best attorney for her case because he was licensed in the State of New York and had extensive securities litigation and regulatory experience including previous work experience at the Securities and Exchange Commission ("SEC") and Prudential Securities among other brokerage houses. Becker immediately wanted to represent Kaplan and requested that the complaint in the 212 Supreme Court Case be sent to him by overnight courier. Becker told Kaplan that she would not win this case (Case #603029/04) without his involvement and expertise.

15. The Plaintiff, Kaplan executed D&G's Retainer Agreement on January 11, 2005 and secured it with a ten thousand dollar, ($10,000.00), fee. After Becker, an Associate at D&G, discussed the case (Case # 603029/04) with Grannum, a Partner, Becker still never disclosed his conflict of interest to Kaplan.

From:DAVIDSON & GRANNUM LLP          18453659190          11/09/2007 12:34 #090 P.009/024

16. Kaplan began working at CIBC on November 17, 1998 and became licensed on January 31, 1999. Kaplan resigned from CIBC on April 16, 1999 and joined Morgan on April 19, 1999. The filing of the NYSE RE-3 Form by Becker caused Kaplan to be unable to get licensed at Morgan until September 1999.

17. Because of Kaplan's "Marked" Form U-4, she was denied employment by the prestigious firms of Wall Street including: Goldman Sachs, Merrill Lynch, Citicorp Smith Barney, UBS, Lehman, Credit Suisse, Wachovia, Fidelity Investments, Royal Bank of Canada, Deutschebank, Stifel Nicholas and Robert Baird. World class banks such as Barclays Bank and Bank of America refused her. In addition regional and Chicago based NYSE members Mesirow Financial, Howe Barnes, William Blair, Rothschild Investment Corp., and David A. Noyes shunned Kaplan. She was virtually blackballed on both Wall Street and LaSalle Street. Kaplan's ruined NASD license began in April 1999 and is still effective today.

18. This NYSE RE-3 Form resulted in Kaplan having to plead out her case in front of the NYSE Regulatory Department (Case #HPD 03-115) and having being barred, suspended for one (1) year and fined one hundred thousand dollars, ($100,000.00), in 2003. Becker put Kaplan out of business. In July 2003 Case #HPD 03-115 appeared in "The Wall Street Journal" and on the Internet which forever defamed and further damaged Kaplan.

19. Kaplan did not discover that Becker was the investigator and the only signatory on the NYSE RE-3 Form until September 11, 2006 during testimony at an Arbitration hearing before the American Arbitration Association entitled 212 Investment Corporation v. Myron Kaplan, Barbara Kaplan et al., Case No. 13-180-Y-00862-05) (hereinafter "212 Arbitration") hearing in New York City.

20. Becker disregarded the cardinal rule of conflict of interest; he never mentioned nor did he provide any written document to Kaplan that would fully disclose his significant conflict of interest. Thus Becker compromised the defense of the 212 Supreme Court Case and 212 Arbitration which had incredible claims of over one hundred million dollars, ($100,000,000.00), because he was greedy and violated one of the cornerstone principles of the legal profession.

21. The 212 Arbitration was commenced in April, 2005, which was after Kaplan had retained Becker and D&G to handle the 212 Supreme Court Case, which was January, 2005. Becker prepared and filed a long and unnecessarily detailed Answer to the 212 Arbitration when all that was required was a simple denial. This greatly ruined the case for Kaplan.

22. This matter was also to be held in New York City and Kaplan elected to continue retaining Grannum on this case, after Becker had left D&G in late August 2005. This case had now evolved into the AAA Arbitration Case (Case # 13-180-Y0086205).

23. This case (Case #13-180-Y-0086205) went through extensive discovery for two (2) years and during the course of Attorney-Client privilege conversations, Grannum revealed privileged information to the Plaintiff's attorneys, Quinn Emanuel Urquhart Oliver & Hedges LLP, (hereinafter "Quinn.")

24. This violation of the sacrosanct attorney-client relationship and a cardinal rule of the legal profession resulted in the Plaintiff's counsel, Quinn, calling three (3) witnesses (Ken Witry, Sheilah McFadden and Roseanne Crimo) to testify in May 2006 in New York City. Quinn would have no knowledge and information of the existence of these witnesses but for Grannum's betrayal of her client, Kaplan. In addition, the D&G Firm engaged in unauthorized

settlement discussions and provided confidential information to Quinn. All of their nefarious actions were an unauthorized violation of the attorney-client privilege.

25. This violation resulted in Kaplan losing the 212 Arbitration and having a judgment against her in excess of seventy million dollars ($70,000,000.00), plus interest which totally and irreversibly devastated Kaplan.

26. This Judgment is currently outstanding and if it is not settled it will bankrupt Kaplan.

### THE GRIMES MATTER

27. In July 2003 one of Kaplan's clients, Gregory Grimes, (hereinafter "Grimes"), filed a Customer Complaint (NASD Arbitration Case 04-04804) against Kaplan and Morgan and with the Regulatory Department (Case #E8A040452) of the NASD.

28. Such complaint (Case #E8A040452) was fully dismissed by the NASD regulatory staff with no action taken against Kaplan and Morgan after fully investigating the claims of Grimes.

29. Subsequent to the NASD regulatory complaint (Case #E8A040452), Grimes also filed a NASD Arbitration claim (Arbitration Case #04-04804) against Kaplan and Morgan with a claim of twenty-three thousand dollars, ($23,000.00), in compensatory damages.

30. This matter (Case #04-04804) was filed in the State of New York and such hearings were to be held in New York City at the direction of the NASD's New York office.

31. Kaplan's Chicago counsel, Rzepczynski, had filed the Answer to the charges and also completed discovery on behalf of Kaplan in the Spring of 2005. Kaplan's Chicago counsel, Rzepczynski had filed the Answer beginning July 2003.

From:DAVIDSON & GRANNUM LLP     18453659190     11/09/2007 12:35 #090 P.012/024

32. Because this Arbitration was to be conducted in New York City, Kaplan and her Chicago counsel elected to retain local counsel to litigate this matter in November of 2005.

33. On March 16, 2005, Becker flew to Chicago on his initiative and met with Kaplan and with her local counsel, Rzepczynski. Becker reviewed the filings and gave his recommendations on the NASD Arbitration (Case #04-04804).

34. Prior to the Grimes hearing date of November 15, 2005, Becker suddenly left the firm of D&G in late August 2005 and took a position in-house out of the private sector.

35. With the hearing date quickly approaching, Becker recommended a named Partner in his firm, Grannum, to replace him in litigating the NASD Arbitration (Case #04-04804).

36. Grannum met with Kaplan in Chicago in November 2005 but refused to include local counsel, Rzepczynski, in the meeting.

37. Grannum and Becker unnecessarily billed vast amounts of time and expenses on the Grimes matter (Case #04-04804) even though it was already investigated and dismissed by the NASD regulatory staff (Case # E8A040452) in early 2005.

38. One example is Grannum's billing for lunch at the Harvard Club in New York City on November 14, 2005 for two thousand two hundred dollars ($2,200.00), despite the fact that virtually no business was discussed.

39. On November 15 and 16, 2005, Grannum attended the one and one-half (1½) day NASD Arbitration (Case # 04-04804) in New York City. In her closing statements she did not bother to plead and give any details for the recovery of legal fees and expenses because the Grimes case was indeed a frivolous lawsuit without merit. Kaplan was billed in excess of thirty-eight thousand dollars, ($38,000.00), defending herself in a case that was already

8

dismissed by the NASD Regulatory Department (Case #E8A040452) in early 2005. This was in addition to the thirty-two thousand dollars, ($32,000.00), already paid to Rzepczynski from July 2003 to November 2005. The vast majority of the work was dismissing the NASD Regulatory (Case #E8A040452) action and was key in the expungement on Kaplan's license. This positive Regulatory decision paved the way for Kaplan's winning the NASD Customer Arbitration (Case #04-04804). It was the two (2) year efforts of Rzepczynski's discovery that transcended the NASD Regulatory Claim (Case #E8A040452). All that was left for Grannum was to attend a one and one-half (1½) day hearing and to prep herself for the NASD Arbitration hearing (Case #04-04804).

40. On December 5, 2005, the NASD Arbitration panel ruled in Kaplan's favor and dismissed the case (Case #04-04804) by unanimous decision, but Kaplan was not awarded any legal fees or expenses as Grannum never even made the petition for such action.

41. Upon issuing the Dismissal Order, it was Grannum's total and complete responsibility to have Kaplan's U-4 amended reflecting the dismissal of the Customer Complaint Arbitration (Case #04-04804) and the detailed facts surrounding this case. A clean NASD Form U-4 is required in order for a Registered Representative to get a NASD license. Exact answers are mandatory on the U-4 Disclosure Form.

42. Grannum was recommended to Kaplan because Grannum was a securities litigation attorney for more then thirteen (13) years and is a Harvard Law School Graduate. Grannum had worked in-house at UBS, a major Wall Street brokerage firm, for more than ten (10) years. Grannum was Senior Vice-President and Senior Associate General Counsel at UBS. Currently, Grannum serves on the Securities Arbitration Committee of the American Bar Association.

43. Only while seeking employment between 2005 through September 2007 did Kaplan discover that the crucial Form U-4 amendment was incorrectly filed by Grannum. Grannum stated Kaplan paid fifteen thousand dollars, ($15,000.00), to Grimes as settlement for his Customer Complaint (NASD Case #04-04804).

44. This was in error since it was Morgan, one of the co-defendants, who had paid the fifteen thousand dollars, ($15,000.00), to Grimes as nuisance only, not Kaplan. Kaplan paid nothing pursuant to the NASD Arbitration Order.

45. This error by Grannum has resulted in Kaplan not being able to secure employment within the brokerage community for the past two (2) years and has caused Kaplan a substantial loss of income to her personally. The following nine (9) firms based on their review of Kaplan's amended Form U-4 that refused to hire her are: (1) National Securities; (2) U.S. Fiduciary; (3) Brewer Investments; (4) Chicago Investment Group; (5) Bertel Fisher; (6) Gunn Ellis; (7) Dawson James; (8) Raymond James; and (9) LaSalle Street Securities.

46. On February 25, 2006 Kaplan terminated Grannum and the law firm of D&G by FAX for the reasons as follows: (1) Grannum's excessive and fictitious billing; (2) Becker's excessive and fictitious bills; (3) the unethical demands on Kaplan to take the Fifth Amendment forty-three (43) times via an Affidavit even though this was not a criminal case and the criminal statute had in fact expired in the 212 Investment case (Case # 13-180-Y-00862-05); (4) Grannum's failure with the Illinois Department of Employment Security, (hereinafter "IDES"), claim (Cases #05-005264 & 05-005336); and (5) Grannum's failure in the Grimes Case (Case # 04-04804) with respect to the awarding of any expenses and fees to Kaplan.

From:DAVIDSON & GRANNUM LLP          18453659190          11/09/2007 12:35 #090 P.015/024

47. Upon termination Grannum presented a final billing for services even though Grannum was the cause of Kaplan losing the 212 Arbitration (Case # 13-180-Y-00862-05) and the 2005 IDES Claims (Cases #05-005254 & 05-005336).

48. It is unknown what additional privileged information Becker may have revealed to the Partners of D&G or to the opposing counsel, Quinn, based on his powerful position at CIBC. However, it is known that Becker had viciously contacted Quinn several times during 2005 without Kaplan's permission and in doing so violated the attorney-client privilege.

49. Upon further investigation of Grannum's actions, Kaplan became aware that Grannum previously had betrayed her client's trust in a matter in California in 2003, Terrance Blanchard vs. UBS-PaineWebber, Scott Flanagan and Sandra Grannum, (Case # 03-CC-06087), which resulted in her termination as General Counsel from UBS and a settlement for the client in the amount of two hundred sixty-five thousand dollars ($265,000.00).

50. Grannum was Senior Associate General Counsel, Employment Division at UBS when she "Mary Cartered" her assigned client, Terrance Blanchard, in the State of California (Case # 03-CC-06087). Grannum betrayed her client and employer, UBS, in a devious manner.

51. Grannum repeated the same cruel and unusual betrayal and "Mary Cartered" Kaplan in 2005 and 2006 in the significant 212 Investment Cases both in the State Court (Case #603029/04) and in the AAA Arbitration Case (Case #13-180-Y-00862-05).

52. It is apparent that Grannum has a history of "Selling out" and unethically betraying the confidentiality of the sacrosanct attorney-client privilege. Grannum at all times acted without consent, knowledge and permission of Kaplan.

11

From:DAVIDSON & GRANNUM LLP          18453659190          11/09/2007 12:35 #090 P.016/024

## WUNDERLICH MATTER

53. Grannum again, in another legal matter involving an employer of Kaplan, egregiously betrayed Kaplan. In Chicago the Equal Employment Opportunity Commission, ("EEOC"), had met with Kaplan during two (2) days in October 2005 and informed her that there was no evidence of discrimination during her employment at Wunderlich Securities, (hereinafter "Wunderlich"), yet Grannum systemically filed a frivolous lawsuit (Case #06-C-0200) against Wunderlich. Grannum therefore subjected Kaplan to liability for having to pay Wunderlich's attorneys' fees (the Law Firm of McGuire Woods LLP) and filing fees.

54. Kaplan had to be represented by Chicago counsel, Rzepczynski, in order to dismiss Kaplan from the court case (Case No. 06-C-0200) in March 2006.

55. In October 2005, Grannum never attempted to contact the Chief Compliance Officer at Wunderlich to amend Kaplan's Form U-4 which erroneously stated Kaplan was fired when actually Kaplan had quit her employment at Wunderlich on September 24, 2005.

56. Wunderlich marked her U-4 claiming she had "no business" yet her W-2 for 2005 from Wunderlich was one hundred and forty-five thousand dollars, ($145,000.00), in earned income. Grannum also neglected to have this fact corrected on the Form U-4.

57. Furthermore, Grannum filed a complaint in late December 2005 to the IDES in Chicago (Cases #05-005264 & 05-005336) asking for five hundred fifty-five thousand dollars, ($555,000.00), in compensation and damages for Kaplan from Wunderlich. The claim should have been for around eighty thousand dollars ($80,000.00).

58. This case was dismissed by the IDES (Cases #05-005264 & 05-005336) on February 13, 2006 due to inconsistent statements made by Grannum. The IDES, via Illinois State Administrative Judge Claudia Manley, informed Kaplan that no appeal was available.

From:DAVIDSON & GRANNUM LLP	18453659190	11/09/2007 12:36 #090 P.017/024

59. Kaplan therefore lost eighty thousand dollars, ($80,000.00), in actual earned income that was due to her from Wunderlich.

60. Kaplan notified Grannum that her case was dismissed on February 16, 2006. Grannum said she could not remember the cases with the IDES (Cases 05-005264 & 05-005336) and did not know what Kaplan was talking about.

## FIRST COUNT
## BREACH OF CONTRACT

61. Kaplan repeats the allegations stated above in paragraphs 1- 60 as set forth herein.

62. Kaplan contracted Becker, Grannum and the D&G law firm to advocate on her behalf with relation to the 212 Investment Cases (New York State Court Case #603029/04 and AAA Arbitration Case #13-180-Y-00862-05), the NASD Grimes arbitration matter (Case #04-048904) and the (EEOC case #06-C-0200) against Wunderlich.

63. During such time each of the Defendants over billed Kaplan for work that was not performed and/or work that was not necessary.

64. This over billing resulted in a lawsuit against Kaplan by D&G and caused additional expenses and legal fees in defending Kaplan against the billing claims.

65. This Breach of Contract has caused disgorgement in the amount of fifty-eight thousand dollars ($58,000.00).

## SECOND COUNT
## LEGAL MALPRACTICE

66. Kaplan repeats the allegations stated above in paragraphs 1 – 60 as set forth herein.

67. It is apparent that Becker while an Associate at D&G retained Kaplan as a client while fully being aware that a conflict of interest existed based on his prior actions.

13

From:DAVIDSON & GRANNUM LLP           18453659190           11/09/2007 12:36 #090 P.018/024

68. At no time was this conflict disclosed to Kaplan in any format nor was a waiver ever obtained from Kaplan.

69. This conflict related to the 212 Investment cases (Case #603029/04 and Case #13-180-Y-00862-05) and violated the attorney-client relationship.

70. Kaplan only became aware of this conflict near the end of the 212 Investment Arbitration and would never have retained Becker or D&G as her counsel if such a conflict had been disclosed to Kaplan at the onset.

71. Ultimately, Kaplan lost the 212 Investment Arbitration and currently has a judgment against her in excess of seventy million dollars, ($70,000,000.00), plus interest.

72. At all the times, all of the Defendants had a duty to disclose this conflict to Kaplan, and because of this omission to disclose the conflict, Kaplan lost the opportunity to obtain counsel who could fully and properly represent Kaplan's interests in the 212 Investment Arbitration.

73. Therefore this conflict has caused Kaplan damages in the amount in excess of seventy million dollars, ($70,000,000.00), including the disgorgement of fees paid to D&G in the amount of fifty-eight thousand dollars ($58,000.00).

### THIRD COUNT
### BREACH OF FIDUCARY DUTY

74. Kaplan repeats the allegations stated above in paragraphs 1 – 60 as set forth herein.

75. During Grannum's representation of Kaplan in the 212 Investment case (Case #13-180-Y-00862-05) Grannum betrayed Kaplan's trust by revealing confidential information surrounding the 212 Investment case (Case #13-180-Y-00862-05) to Quinn.

76. Without approval from Kaplan, Grannum revealed such information to opposing counsel which was the direct result and the proximate cause in Kaplan losing the 212 Investment case (Case #13-180-Y-00862-05) and caused a judgment against Kaplan for seventy million dollars ($70,000,000.00).

77. As a direct result of the failure of the Defendants to perform its professional duties to Kaplan, to honor their commitment to her as her attorneys, and to perform and exercise reasonable care and diligence on behalf of Kaplan, Kaplan has sustained financial loss, anguish, aggravation and mental suffering and has been the cause of expenses and monetary loss.

78. The failure of the Defendants to act fully and properly on behalf of Kaplan was due solely and completely due to their negligence, carelessness, fraud, indifference, and malpractice against Kaplan.

79. Therefore this violation of the attorney-client relationship has caused Kaplan damages in the amount in excess of seventy million dollars, ($70,000,000.00), including the disgorgement of fees paid to D&G in the amount of fifty-eight thousand dollars ($58,000.00).

## FOURTH COUNT
## LEGAL MALPRACTICE

80. Kaplan repeats the allegations stated above in paragraphs 1 – 60 as set forth herein.

81. Kaplan retained Grannum with respect to labor issues, including back pay that Kaplan had with her former employer Wunderlich.

82. Grannum filed both a Federal lawsuit against Wunderlich via an EEOC claim (Case #06-C-0200) and claims with IDES (Claims 05-005264 & 05-005336).

15

83. Since the EEOC claim was filed the IDES fully dismissed Kaplan's claim and barred any appeal of her claims.

84. Subsequently, the EEOC claim (Case #06-C-0200) was viewed as frivolous and dismissed out of fear of liability from the Defendant's counter claim for legal fees.

85. As a direct result of the failure of Grannum and D&G to perform their professional duties to Kaplan, to honor its commitment to Kaplan as her attorneys, and to perform and exercise reasonable care and diligence on behalf of Kaplan, Kaplan has sustained financial loss, anguish, aggravation, and mental suffering and has been the cause of expenses and monetary loss.

86. The failure of Grannum and D&G to act fully and properly on behalf of Kaplan was due solely and completely to their negligence, carelessness, fraud, indifference and malpractice without any actions of Kaplan contributing thereto.

87. Both Grannum and D&G had a duty at all times to represent Kaplan fully, properly and completely, but failed to properly use its professional knowledge and/or failed to gain the requisite knowledge needed to adequately defend Kaplan.

88. This direct error by Grannum was the proximate cause which estopped Kaplan from pursuing her claim for back wages and caused damages in the amount in excess of one hundred and twenty-five thousand dollars, ($125,000.00), in addition the disgorgement of fees paid to D&G in the amount of fifty-eight thousand dollars ($58,000.00).

## FIFTH COUNT
## LEGAL MALPRACTICE

89. Kaplan repeats the allegations stated in paragraphs 1 – 60 as set forth herein.

From:DAVIDSON & GRANNUM LLP          18453659190          11/09/2007 12:36 #090 P.021/024

90. Upon the NASD issuing the final Order in the Grimes Case (Case #04-04804), Grannum assured Kaplan that Grannum would amend her NASD Form U-4 reflecting that the Customer Complaint was dismissed.

91. This action should have been done in December 2005 and would have removed a "Mark" against Kaplan's NASD License.

92. Apparently, Grannum instead amended Kaplan's NASD Form U-4 reflecting that Kaplan settled this claim by paying Grimes fifteen thousand dollars, ($15,000.00), when it was Morgan who had settled this issue with Grimes by paying Grimes fifteen thousand dollars ($15,000.00).

93. This error which was entered directly by Grannum showing a Customer Complaint against Kaplan was the proximate cause of why Kaplan was not to be hired by numerous brokerage firms, from December 2005 until September 2007, when the error was ultimately discovered and the NASD Form U-4 was corrected.

94. As a direct result of the failure of Grannum and D&G to perform their professional duties to Kaplan, to honor their commitment to Kaplan as her attorneys, and to perform and exercise reasonable care and due diligence on behalf of Kaplan, Kaplan has sustained financial loss, anguish, aggravation and mental suffering and has been the cause of the expenses and monetary loss therefrom.

95. The failure of Grannum and D&G to act fully and properly on behalf of Kaplan was due solely and completely to its negligence, carelessness, fraud, indifference and malpractice without any actions of the Kaplan contributing thereto.

17

96. Both Grannum and D&G have a duty at all time to represent Kaplan, fully, properly and completely, but failed to properly use its professional knowledge and/or failed to gain the requisite knowledge needed to adequately represent Kaplan.

97. This error by Grannum resulted in damages of lost income in excess of two million dollars, ($2,000,000.00), including disgorgement of fees paid to D&G in the amount of fifty-eight thousand dollars ($58,000.00).

## SIXTH COUNT
## BREACH OF NEW YORK STATE JUDICIARY LAW SECTION 487

98. Kaplan repeats the allegations stated above in paragraph 1- 60 as set forth herein.

99. New York State Judiciary Law Section 487 provides, in relevant part, as follows: "An attorney ... who: 1. Is guilty of any deceit ... or consents to any deceit ... or consents to any deceit to any party ... forfeits to the party injured treble damages to be recovered in a civil action.

100. By failing to tell Kaplan of the obvious conflict of interest in the 212 Investment cases all Defendants deceived Kaplan.

101. By breaching the attorney-client privilege and informing the opposing counsel of confidential information which was the direct cause of the liability loss to Kaplan of the 212 Investment Arbitration.

102. By engaging in unauthorized settlement discussions and providing confidential information to the opposing counsel which further caused harm to Kaplan in her defense during the 212 Investment Arbitration case.

103. All the Defendants are in violation of New York State Judicial Law Section 487 and should forfeit treble damages to Kaplan as well be held responsible and liable for punitive damages to Kaplan.

Barbara R. Kaplan

*[signature]*

Barbara R. Kaplan

11-1-07

Gregg M. Rzepczynski & Associates, Ltd.
Gregg M. Rzepczynski
175 West Jackson, Blvd., Ste. 1650
Chicago, Illinois 60604
Tel: (312) 939-8028
Fax: (312) 922-1794

19