SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:   PART 49
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
212 Investment Corporation, Alice Dodge Wallace,
Bagan 1992 Family Trust, Bernard Greenberg Family
Trust, Burton S. Benovitz, M.D., Carolyn G. Nelson, CLB
Trust, Cynthia S. Raskin, Dodge Associates Doriss Lakin
Zafrani Irrevocable Trust 1991, Doriss Zafrani Irrevocable
Trust 1987, Drake Limited Partnership, Grant Bagan,
Harvey S. Klein, Hand G. Nelson Foundation, Joyce
Baggan, Judith & Harvey Klein Family Limited
Partnership, Julius P. Fouts Pension Plan, Margo Lakin
1987 Irrevocable Trust, Margo J. Lakin 1991 Investment
Trust, Milida Investors, Nathan Shapell Trust, Robert H.
Schock, Robert D. Stein, Seymour Bagan, Shapell
Industries, Inc., Vera S. Guerin Trust, Derivatively on
Behalf of Kaplan, Nathan & Co.,

Plaintiffs,

-against-                                                  Index No. 603029/04

Myron Kaplan, Kaplan, Nathan & Co. LLC, Barbara
Kaplan and Alan Stark,

Defendants,

-and-

Kaplan, Nathan & Co.

Nominal Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CAHN, J.

      Plaintiffs, limited partners (the Limited Partners) of nominal defendant Kaplan,

Nathan & Co. (the Partnership) commenced this derivative action on behalf of the Partnership,

alleging causes of action for, inter alia, breach of fiduciary duty and fraud.  The action was

principally directed against defendants Myron Kaplan and Barbara Kaplan.

EXHIBIT
2

Plaintiffs are also claimants in an arbitration proceeding entitled <u>212 Investment Corp. et al v Kaplan, Nathan & Co., et al</u> (AAA Case No. 13 180 Y 00862 05) (the Arbitration).

**The Various Motions:**

In Motion Sequence No. 014, plaintiffs seek a pre-judgment order of attachment against the assets of defendant Myron Kaplan. On October 6, 2006, this court entered an order temporarily restraining Myron Kaplan from transferring, devising or mortgaging any personal or real property in which he has any interest of any sort, etc. (the October 6, 2006 Order). The court entered the October 6, 2006 Order on the representation that the specific assets of Myron Kaplan, including his art collection and real estate, would serve as adequate collateral against any award levied against him by the arbitration tribunal.

In Motion Sequence No. 016, plaintiffs also seek a pre-judgment order of attachment against the assets of defendant Barbara Kaplan. On February 6, 2007, this court entered an order temporarily restraining Barbara Kaplan from transferring or paying any of her assets, or transferring or devising any personal or real property in which she has an interest of any sort, etc.

In Motion Sequence No. 015, plaintiffs seek confirmation of a nearly $77,000,000.00 arbitration award entered against defendants Myron Kaplan and Barbara Kaplan, together with interest, and a direction that judgment be entered thereon. Plaintiffs also seek to modify the October 6, 2006 Order to include all bank accounts, brokerage accounts and investments of Myron Kaplan.

On February 5, 2007, this court entered an order temporarily restraining and enjoining Myron Kaplan from transferring, selling, or otherwise disposing of assets from any of his bank accounts, brokerage accounts, and investments, including, but not limited to, Myron

2

Kaplan's brokerage accounts numbered 5XN-380244, 5XN-001857, and 5XY-002309 at

Deutsche Bank Alex. Brown, his brokerage account numbered 832-02667 at Lehman Brothers,

his brokerage account numbered 759-48307 at Bear Stearns Securities Corp., and his shares and

assets in North Fork Preserve, Inc. The order also provided that Myron Kaplan may continue

trading in such brokerage accounts without any release of funds from such accounts to him or for

his benefit, except that Deutsche Bank Alex. Brown may release $25,000.00 to Myron Kaplan on

the first day of each month.

On February 25, 2007, this court entered an order continuing the temporary

restraining order, with the exception that Myron Kaplan was not permitted to continue trading in

any open accounts, but could liquidate positions or cover short positions if there were any,

provided that any monies received on liquidation of positions were to remain in the accounts,

and could not be withdrawn without a further court order. The court further ordered that

liquidation or coverage of short positions should take place prior to 4:00 p.m. on February 28,

2007.

On May 29, 2007, during oral argument, this court held that the temporary

restraining orders against Myron Kaplan and Barbara Kaplan would continue until a decision

was reached on plaintiffs' motion for confirmation of the arbitration award.

**The Facts:**

Plaintiffs allege the following. In 1969, Myron Kaplan, a New Jersey resident,

founded the Partnership with James Nathan (Nathan). The Partnership is a hedge fund. As one

of its general partners, Myron Kaplan placed securities trades every day in the Partnership

account (the Partnership Account). At the same time, he also placed daily trades in his own

personal accounts (the Kaplan Accounts). To execute the trades for the Partnership Account and

3

for the Kaplan Accounts, Myron Kaplan retained his sister, Barbara Kaplan, a registered representative. On numerous occasions, Barbara Kaplan placed orders to buy or sell securities for the Kaplan Accounts at the same time or close to when she placed similar orders for the Partnership Account. Many of these trades were in the same securities for all the accounts.

It is alleged that, at various times, Barbara Kaplan would execute a trade, and fail to specify the account for which it was executed, i.e., for the Partnership Account, or for the Kaplan Accounts. The securities that were purchased or sold were later allocated to a particular account, depending on profitability of the trade, i.e., the more profitable trade was allocated to the Kaplan Accounts, while the less profitable was allocated to the Partnership Account.

Transactions were also conducted in the Kaplan Accounts ahead of transactions in the same securities for the Partnership Account, in order to benefit the Kaplan Accounts. If there was to be a purchase of a large block of shares in a specific security by the Partnership, it was assumed that the large purchase would cause the price of the security to rise. Thus, in some situations, the Kaplan Accounts would purchase shares of the security before the Partnership Account, thereby recouping an immediate profit when the Partnership Account drove up the price of the stock. A similar tactic (in reverse) would sometimes be used when the Partnership Account was selling a large block of shares.

Also, the Partnership Account was charged higher commissions than the Kaplan Accounts.

For many years, Barbara Kaplan was employed by Bear Stearns & Co. (Bear Stearns), but she later worked for CIBC Oppenheimer (CIBC). Upon her departure from CIBC in 1999, the New York Stock Exchange (the NYSE) launched an investigation into her trading practices to determine whether she improperly facilitated numerous transactions that benefitted

4

the Kaplan Accounts to the detriment of the Partnership Account. Specifically, the NYSE sought to ascertain whether Barbara Kaplan, at her brother's direction, entered trades without account numbers, and then allocated those trades after their execution in a way that the Kaplan Accounts received better execution prices than the Partnership Account. Further, the NYSE sought to learn whether she had reallocated certain securities to the Partnership Account from the Kaplan Accounts after Myron Kaplan deemed them to be "loser" trades.

On June 12, 2003, the NYSE found that Barbara Kaplan had effected improper post-execution allocations on approximately 375 occasions between November 1998 and April 1999 for trades which she knew, or should have known, would result in more favorable prices being allocated to her brother's account, to the detriment of an account with public investors. The NYSE censured Barbara Kaplan, suspended her from the securities industry for one year, and fined her $100,000.00.

Subsequently, Barbara Kaplan entered into a stipulation admitting her improper actions, i.e., that she had entered trades without reference to account numbers, and improperly given preferential trades to the Kaplan Accounts over the Partnership Account at the end of the trading day.

Plaintiffs allege that defendants deliberately concealed from, and failed to disclose the NYSE investigation to, the Limited Partners and the Partnership, and that the Limited Partners first learned of the wrongdoing in a July 6, 2004 letter from Nathan. Plaintiffs allege that the Limited Partners then analyzed the trading records, and determined that in nearly 85% of the same-day, same-security trades entered for both the Kaplan Accounts and the Partnership Account, Myron Kaplan received the better price. Subsequently, the Limited Partners filed suit in this court, asserting claims for fraud and breach of fiduciary duty.

5

**The Within Action:**

Myron Kaplan moved to stay this action, and sought an order that he, plaintiffs, and defendant Kaplan, Nathan & Co. LLC (the LLC)[1] submit the dispute to arbitration pursuant to Section 9.10 of the Partnership Agreement.

**The Arbitration:**

On February 9, 2005, this court held that the Federal Arbitration Act (the FAA), and not the CPLR, would govern this action, and ordered the parties to arbitration. Based upon this order, plaintiffs and defendants Myron Kaplan and the LLC submitted the dispute to the American Arbitration Association. Shortly thereafter, plaintiffs and defendant Barbara Kaplan agreed by stipulation that the claims against her would proceed in the same arbitration before the AAA.

On April 11, 2005, plaintiffs served a Statement of Claim alleging, inter alia, breach of fiduciary duty and fraud against defendants[2].

On May 10, 2006, all defendants served their answers, basically denying plaintiffs' allegations. Several weeks later, third-party defendant Nathan filed an answer seeking indemnification and contribution from Myron Kaplan, as well as seeking indemnification from the Partnership.

A Panel was duly appointed under the rules of the AAA.

---

[1] In 1997, the LLC, of which Myron Kaplan and James Nathan were the sole members, became the general partner of the Partnership.

[2] The claims in plaintiffs' original complaint for joint and several damages for Partnership losses, disgorgement of compensation paid to defendants, punitive damages and interest are substantially identical to the claims set forth in plaintiffs' Statement of Claim in the Arbitration.

6

Between May 15, 2006 and October 31, 2006, the parties participated in 16 evidentiary hearings before the Panel, and submitted approximately 1,075 exhibits. The Panel heard the testimony of 15 witnesses resulting in nearly 5,000 pages of transcripts.

Among the witnesses who testified were three current or former employees of Bear Stearns and CIBC, the brokerage houses that employed Barbara Kaplan, and with whom Myron Kaplan did significant business for himself and on behalf of the Partnership. In describing the misconduct in which they had participated at the direction of Myron and Barbara Kaplan, these witnesses gave sworn testimony contrary to their own interests, and the interests of the brokerage firms for which they were employed, regarding the trading practices of Myron and Barbara Kaplan.

The Panel also considered sworn testimony given before the NYSE by four former employees of CIBC during the NYSE investigation. Like the witnesses who appeared live at the Arbitration, many of these CIBC witnesses also testified against their own interests about the fraudulent trading practices carried out by Barbara Kaplan at Myron Kaplan's direction.

Additionally, the Panel heard testimony from several expert witnesses.

The Panel also considered testimony from the key parties to this action, including over three days of testimony from defendant Myron Kaplan, two days of testimony from defendant Barbara Kaplan, and two days of testimony from Nathan, Myron Kaplan's co-general partner in the Partnership. The Panel also heard the testimony of two of the plaintiffs, and from defendant Alan Stark, who served as the Partnership's lawyer for the relevant periods. The Panel also considered Barbara Kaplan's representations concerning Myron Kaplan's misconduct, as stated by Sandra Grannum, Barbara Kaplan's prior counsel. Finally, the Panel heard the

7

testimony of Harry Weinbaum, Myron Kaplan's personal bookkeeper, who reported that Myron

Kaplan had ordered him to conduct an analysis of trading, which ultimately confirmed that

Myron Kaplan had benefitted at a preference rate of 90% over the Partnership.

   The Panel asked all parties whether punitive damages were available as a remedy.

The request was made off the record, and all parties agreed that punitive damages were a

potential remedy that the Panel could award (see Michael Bogner Aff., ¶ 13).

### The Arbitrators' Award – Decision:

   On January 29, 2007, the Panel transmitted the arbitration award (the Award) to

the parties.  In the 13-page Award, "based upon [its] evaluations of the credibility of the

witnesses and . . . documentary evidence," the Panel found that Myron and Barbara Kaplan

"knowingly and willfully defrauded [plaintiffs] and grossly breached their fiduciary duties to

[plaintiffs]" by "intentionally and wrongfully engag[ing] in post-execution allocation of

securities trades such that Myron Kaplan's personal accounts systematically received

preferential treatment over so much of the accounts of [the Partnership] as were directed by

Myron Kaplan, and brokered by his sister, Barbara Kaplan" (Award, at 2 [2/2/07 Aff. of Michael

B. Carlinksy , Exh D]).

   The Panel also found that the testimony of Bear Stearns and CIBC witnesses was

especially credible since "many of these witnesses testified against their own interests and some

testified to direct involvement by Myron Kaplan" (id. at 4).  The Panel further found that

Barbara Kaplan's "later disavowals of all [her] sworn admissions based upon allegations of

illness, lack of appropriate advice and/or counsel, or a desire to put 'the matter behind' her were

simply not credible" (id. at 3).  Similarly, Myron Kaplan's "later disavowal of [his own]

admissions and his later claims that Barbara Kaplan 'did nothing wrong' and that he advised

8

Barbara Kaplan not to stipulate to the New York Stock Exchange findings were directly refuted

by Barbara Kaplan herself, and were not credible" (id.). As a result, the Panel found "that the

belated attempts by Myron Kaplan and Barbara Kaplan to attack the stipulated findings of the

New York Stock Exchange and to create scenarios to explain such evidence are simply not

credible" (id. at 8).

   Additionally, plaintiffs introduced evidence showing that defendants engaged in

other trading improprieties, such as reallocations of entire trades to or from the Partnership

Account that had already been entered. For example, if a trade executed on behalf of the

Partnership turned out profitably, at the end of the day defendants would shift that trade from the

Partnership Account into one of the Kaplan Accounts; conversely, if a trade executed on behalf

of one of the Kaplan Accounts turned out unfavorably, it would be shifted from that personal

account into the Partnership Account. Based upon this evidence, the Panel found it "likely that

there was misallocation of trades by Myron Kaplan and Barbara Kaplan in that they wrongfully

allocated favorable trades to the accounts of Myron Kaplan personally and unfavorable trades to

the Partnership accounts where such trades were not part of the same day same security

transactions" (id. at 7).

   The Panel also determined that Myron Kaplan and Barbara Kaplan "knowingly

and willfully attempted to cover up their wrongdoing by engaging in significant obstructive

tactics" before and during the Arbitration (id. at 5). Finally, the Panel determined that

defendants had engaged in serious misconduct during the Arbitration when they

> wrongfully prolonged this arbitration proceeding and did not
> comply with Procedural Orders issued by this Tribunal in that,
> they failed to provide documents which were correctly the subject

> of discovery and they persistently sought to introduce documentary evidence as trial exhibits without producing them previously to other parties in this arbitration proceeding, contrary to the clear Orders of this Tribunal

(id. at 8).

Based on the foregoing findings, the Panel explicitly found defendants liable for the improper trading benefits, plus interest, that defendant Myron Kaplan obtained during the period 1991-1999 as a result of same-day same-security trading improprieties. The Panel further found that "Myron Kaplan having defrauded and having consistently breached his fiduciary duties to [plaintiffs], must disgorge" all compensation, plus interest, that he received during that time as general partner of the Partnership (id. at 9-12). The Panel assessed interest on portions of the Award at a rate of 9% per annum (id.). The Award also requires that defendants pay back the portion of the brokerage commissions that the Partnership (at Myron Kaplan's direction) paid to Barbara Kaplan during that period (id.).

The Panel also found that the "deplorable and reprehensible conduct of Myron Kaplan and Barbara Kaplan justifies an Award of punitive damages against them for the benefit of [plaintiffs]" in the amount of $16,336,288.00 (id. at 9). The Award also requires defendants to pay the parties' attorneys' fees and to bear the costs of the Arbitration (id.).

Going forward, the Award orders Myron Kaplan to cease any activities on the Partnership's behalf, and requires that his capital account in the Partnership be liquidated to satisfy the amounts owed by him under the Award (id.). Defendants Myron and Barbara Kaplan are to bear all damages jointly and severally (id.).

10

The Panel denied the claims of Myron Kaplan and Barbara Kaplan for indemnification, reimbursement, and attorneys' fees, and all claims against Nathan (id.).

Specifically, the Panel ordered Myron Kaplan and Barbara Kaplan to pay the following amounts:

1. $16,336,288.00 to the Partnership, as a result of the wrongful allocation of trades;

2. $35,041,131.00 to the Partnership, representing the return of Myron Kaplan's performance fees, including interest at a rate of 9% per annum;

3. $4,199,503.00 to the Partnership, representing commissions paid to Barbara Kaplan plus interest at a rate of 9% per annum;

4. $16,336,288.00 to plaintiffs for punitive damages;

5. $3,055,000.00 to plaintiffs for attorneys' fees and disbursements;

6. $1,572,700.00 to Nathan, a respondent in the Arbitration, for attorneys' fees and costs; and

7. $220,169.00 to the LLC for attorneys' fees and costs, less any amount already paid by Myron Kaplan.

The Award was in full and final settlement of all claims and counterclaims submitted to the Arbitration.

**Defendants' Position on the Motion to Confirm:**

Defendants oppose confirmation of the Award on the grounds that the Panel's interpretation of the evidence was incorrect, the Award is in manifest disregard of the law, and the arbitrators exceeded their authority.

11

**The Law:**

**Manifest Disregard of the Evidence**

       Defendants have not raised a valid legal or factual argument that the Award should be vacated based on the Panel's manifest disregard of the evidence. Manifest disregard of the evidence is never a proper ground for vacatur of an arbitration award (see Wallace v Buttar, 378 F3d 182, 193 [2d Cir 2004] ["the Second Circuit does not recognize manifest disregard of the evidence as a proper ground for vacating an arbitrator's award"] [citation omitted]; Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d 471, 479, cert dismissed ___ US ___, 127 S Ct 34 [2006] ["we have stated time and again that an arbitrator's award should not be vacated for errors of . . . fact committed by the arbitrator"]; InterDigital Comm. Corp. v Nokia Corp., 407 F Supp 2d 522, 532 [SDNY 2005] [the court is "obliged to accept the factual findings of the arbitrators"]; InterChem Asia 2000 Pte. Ltd. v Oceana Petrochemicals AG, 373 F Supp 2d 340, 349 [SDNY 2005] [even "a clear error in fact-finding . . . is insufficient to justify disturbing an arbitration award"]).

       Here, defendants simply engage in a lengthy recital of the evidence, and argue that the Panel's interpretation of that evidence was incorrect. For example, Myron Kaplan asserts that "the evidence relied upon to establish Myron's purportedly fraudulent conduct was either unrelated to Myron, misinterpreted by the arbitrators or sufficiently contradicted as to preclude a finding of clear and convincing evidence" (Myron Kaplan Brief, at 37). Myron Kaplan further argues that "none of the 'evidence' in fact remotely suggests that Myron knowingly directed the allocation scheme and does not support the Panel's finding of 'reprehensible' conduct"; that the arbitrators do not, as they cannot, point to any specific

allegation in the answer that Myron directed the trades be allocated to his benefit after

execution"; that "the Panel's reliance on [plaintiffs' expert witnesses's] statistical report as proof

of fraudulent intent and its rejection of Myron's testimony as not credible must be rejected"; "the

testimony of Bear Stearns witnesses was contradictory and inconclusive"; and that the Panel

"misconstrued settlement efforts and litigation conduct as a cover-up" (id. at 4-19, 38-42; see

also Barbara Kaplan Brief at 2-24, 27 [disputing the Panel's view of which evidence was

credible]). The issues of credibility, weight and meaning of the evidence are issues for the

Panel, which had the opportunity to see and hear the witnesses. The court will not substitute its

view of the evidence and of credibility for that of the Panel.

        The Panel provided the parties with a detailed explanation of its findings of fact

based on the evidence presented and its determination of the credibility of witnesses. Given the

deference accorded to such arbitral fact-finding, the court rejects defendants' arguments about

which evidence was credible, or what the Panel should have found.

**Manifest Disregard of the Law**

        Defendants' arguments that the arbitrators manifestly disregarded the law are also

rejected. Courts have consistently held that manifest disregard of the law by arbitrators is a

"severely limited doctrine . . . a doctrine of last resort limited to the rare occurrences of apparent

egregious impropriety on the part of the arbitrators, where none of the provisions of the FAA

apply" (Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d at 480 [citation and internal

quotation marks omitted]; see also Duferco Intl. Steel Trading v T. Klaveness Shipping A/S, 333

F3d 383, 388 [2d Cir 2003] [rejecting manifest disregard of the law argument, and affirming

district court's confirmation of arbitral award]; DiRussa v Dean Witter Reynolds Inc., 121 F3d

818, 823-24 [2d Cir 1997], cert denied 522 US 1049 [1998] [holding that failure of arbitrators to award attorneys' fees under the Age Discrimination in Employment Act was not manifest disregard of the law]). The doctrine of manifest disregard, therefore, "gives extreme deference to arbitrators" (Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d at 481). In fact, since 1960, the Second Circuit Court of Appeals has vacated some or all of an award on this basis in only four out of at least 48 cases where the standard was applied (id.).

The party seeking vacatur bears the burden of proving manifest disregard of the law (Westerbeke Corp. v Daihatsu Motor Co., Ltd., 304 F3d 200, 209 [2d Cir 2002]). As the Court of Appeals has emphasized, the standard is not error, but rather "egregious impropriety," which can be satisfied only where the party seeking vacatur points to "explicit evidence in the record" of "deliberateness or willfulness . . . that shows the arbitrators' intent to flout the law" (Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d at 484). Thus, "[t]o modify or vacate an award on the ground of manifest disregard of the law, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case" (id. at 481 [citation and internal quotation marks omitted]).

The first prong actually involves two elements, since "[i]t is not enough that the moving party provide proof that the arbitrator was aware of the governing legal principle; there must also be a showing of intent" (Westerbeke Corp. v Daihatsu Motor Co. Ltd., 304 F3d at 217). "In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem" (Duferco Intl. Steel Trading v T. Klaveness Shipping A/S, 333 F3d at 390; Roffler v Spear, Leeds & Kellogg, 13 AD3d 308, 310 [1st Dept

14

2004] [party opposing award must show arbitrator appreciates the existence of clearly governing legal principle and ignores it]). The court will only impute knowledge of governing law identified by the parties (Duferco Intl. Steel Trading v T. Klaveness Shipping A/S, 333 F3d at 390).

The second prong involves consideration of whether the law allegedly ignored was clear, and explicitly applicable to the arbitration, and whether it was improperly applied, leading to an incorrect result (id.).

If such a showing of both prerequisites cannot be made by the party opposing the award, a court must confirm it.

Here, defendants fail to meet their heavy burden of demonstrating manifest disregard of the law. More specifically, defendants' arguments fail because: (1) in virtually every instance, they never presented to the Panel the legal principles that they now claim the Panel disregarded; (2) defendants provide no proof that the Panel acted intentionally to flout the law; and (3) none of the legal principles now asserted by defendants were so "well defined, explicit, and clearly applicable to the case" (Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d at 481) so as to justify a finding of manifest disregard of the law.

## 1.    Prejudgment Interest on Disgorgement of Compensation

Myron Kaplan argues that the Panel manifestly disregarded New York law that forfeiture of compensation under the faithless servant doctrine may not include prejudgment interest. However, with respect to the first prong of the "manifest disregard of the law" test, he fails to demonstrate, or even assert, that this legal principle was brought to the Panel's attention, and that the Panel refused to apply it or ignored it, see page 15, above.

15

As to the second prong, Myron Kaplan also fails to demonstrate that the Panel intentionally violated a "well defined, explicit, and clearly applicable" legal principle. First, it is not clear that the interest awarded on the disgorgement of Myron Kaplan's performance fees is "prejudgment interest." The Award makes no indication that the Panel applied 9% interest to the disgorgement as prejudgment interest, and indeed, it is possible that the Panel used the rate as a proxy for the time value benefit Myron Kaplan received from his ill-gotten gains[3].

In any event, "[t]he authority of the arbitrators to award interest is well settled" (In re United States Offshore, Inc. v Seabulk Offshore Ltd., 753 F Supp 86, 92 [SDNY 1990]). An award of a reasonable rate of return is well within the broad powers conferred upon the Panel by AAA Rule 43(a) to "grant any remedy or relief that the arbitrator deems just and equitable" (Rule 43 [a] [Stryker Aff., Exh XXXXX]). Plaintiffs requested in their Statement of Claim that the Panel grant whatever relief was just and appropriate, including a "reasonable rate of return" on any damages or forfeiture of compensation (Statement of Claim, at 27 [Stryker Aff., Exh E]). This prayer was identical to the original complaint in which plaintiffs sought "joint and several damages for all losses that the Partnership incurred as a result of the acts and omissions of Defendants plus a reasonable rate of return" (Complaint, at 27). Thus, the Panel granted such relief, as was its right under the broad remedial powers conferred to it.

Moreover, it is axiomatic that the disgorgement of compensation by a disloyal fiduciary may include the interest that was denied to the fiduciary's clients during the period of disloyalty (see SEC v Svoboda, 409 F Supp 2d 331, 345-46 [SDNY 2006] [imposing

---
[3]

Testimony in the Arbitration suggested that Myron Kaplan's personal rate of return on his use of these funds was greatly in excess of 9% (see Wendy Stryker Aff., Exh A, at 4398:22-4401:16; Exh C, at 38-39).

prejudgment interest on defendant's disgorgement]).

The cases that defendants cite do not stand for the proposition that interest awarded on disgorgement is improper.  Indeed, defendants seek to rely on CPLR 5001 [a], which, contrary to their argument, actually grants discretion to award "in an action of an equitable nature, interest and the rate and date from which it shall be computed."  Thus, defendants have failed to demonstrate that in its award of prejudgment interest, the Panel contravened a well-settled rule of law.

### 2.    Faithless Servant Doctrine

Myron Kaplan contends that the disgorgement remedy is based on the common law "faithless servant" doctrine, and that the Panel manifestly disregarded New York law that the "faithless servant" doctrine does not apply to partners.  More specifically, he argues that the disgorgement remedy is limited to instances of dishonest or disloyal conduct by employees or agents, and does not apply where partners are found to have taken benefits from the partnership to which they were not entitled.

However, Myron Kaplan failed during the Arbitration to raise most of his arguments that disgorgement is unfounded and, as such, he cannot satisfy the first prong of the "manifest disregard of the law" standard.  Although he contends, at page 12 of his Post-Hearing Reply Brief, that he raised the argument that the faithless servant doctrine "does not apply where partners are found to have taken benefits from the partnership to which they were not entitled" (Myron Kaplan Brief, at 23), this contention is incorrect.  A review of page 12 of the Post-Hearing Reply Brief (Stryker Aff., Exh X) discloses only the very different argument that disgorgement is available as to fees earned by the general partner, but that the allocations to the Kaplan Accounts did not constitute such fees.  Indeed, in his Post-Hearing Reply Brief, Myron

17

Kaplan conceded that "a fiduciary found to be disloyal may be required to return compensation paid to him . . . during the time period of disloyalty" (id.), which concession is in sharp contrast to his current argument that his status as a partner/fiduciary exempted him from this remedy. Thus, since defendants' current argument was not raised during the Arbitration, there can be no determination that the Panel manifestly disregarded the law in not ruling in favor of defendants on this point.

Defendants also fail to identify any "well defined, explicit, and clearly applicable" rule of law.  The law is clear that disloyal fiduciaries must disgorge all wrongful benefits obtained by their disloyalty, including compensation and interest (see, e.g., Phansalkar v Andersen Weinroth & Co., LLP, 344 F3d 184, 208-10 [2d Cir 2003] [ordering forfeiture of disloyal fiduciary's compensation including non-cash "partner allocations" and interests in investment opportunities]; Design Strategy, Inc. v Davis, 469 F3d 284, 291 [2d Cir 2006] [same]).  The Panel thus had ample justification to order that Myron Kaplan's improper trading benefits, his compensation as a fiduciary/general partner of the Partnership, and Barbara Kaplan's commissions earned for brokerage services be returned to the Partnership.

### 3.    Joint and Several Liability

In arguing that the Panel cannot impose joint and several liability against defendants for their joint fraud and breach of fiduciary duty, defendants fail to satisfy the first prong of the "manifest disregard of the law" standard, because they do not include any assertion that the alleged legal principle on which they base the claim, was brought to the Panel's attention.

Defendants also fail in their attempt to identify a "well defined, explicit and clearly applicable" legal principle.  The Panel properly found that Myron and Barbara Kaplan

18

are jointly and severally liable for the Award. The Panel had broad equitable powers under

AAA Rule 43 (a), which conferred upon it the authority to "grant any remedy or relief that the

arbitrator deems just and equitable," to impose joint and several liability, which was requested in

both plaintiffs' original complaint and their Statement of Claim.

Defendants' arguments against joint and several liability lack merit. First, they

argue that the Award is internally inconsistent because it reads first that "Barbara Kaplan must

pay back to the Partnership brokerage commissions" (Award, at 9), and then later states that both

defendants are jointly and severally liable for those commissions (id. at 9-10). They fail to point

out, however, that the opening declaration of the Award specifically provides that defendants are

jointly and severally liable for all damages, stating that "[w]ithin thirty (30) days of this Award,

Respondents Myron Kaplan and Barbara Kaplan shall pay the following . . ." (id. at 9). This

language makes clear that the Panel intended Myron and Barbara Kaplan to bear joint and

several liability for their acts of fraud and breach of fiduciary duty. Moreover, even assuming

that the Award is "internally inconsistent" (Myron Kaplan Brief, at 31), "internal inconsistencies

within an arbitral judgment are not grounds for vacatur" (Westerbeke Corp. v Daihatsu Motor

Co. Ltd., 304 F3d at 211).

Defendants also argue, citing Zell & Ettinger v Berglas (261 AD2d 613 [2d Dept

1999]), that a disgorgement remedy is "personal and can only be imposed on the actual recipient

of the benefit" (Myron Kaplan Brief, at 32). However, it should be noted that that action related

to a situation where the movant, defendant husband, convinced the court that "he did not

exercise dominion or control over the misappropriated funds, and there was no showing that he

obtained any benefit that in equity and good conscience he should not have obtained" (id. at 613

[citations omitted]). Further, contrary to defendants' argument, there is a significant body of

authority holding that "[w]hen apportioning liability for disgorgement among multiple

defendants, courts have the discretion to find joint and several liability when two or more

individuals collaborate in the illegal conduct" (SEC v Haligiannis, 470 F Supp 2d 373, 385

[SDNY 2007]; see also SEC v Svoboda, 409 F Supp 2d at 336, 346 [imposing joint and several

liability on defendant for disgorgement of co-conspirator's portion of penalty]).

### 4.    Punitive Damages

Although defendants agreed during the Arbitration proceeding that punitive

damages were an available remedy (see Bogner Aff., ¶ 13), and never challenged the Panel on

whether punitive damages were available, they now assert various challenges to the punitive

damages award, none of which were brought to the Panel's attention (see Myron Kaplan Brief, at

33-37). Defendants thus clearly fail the first prong of the "manifest disregard of the law"

standard.

Defendants have also failed to identify a "well defined, explicit, and clearly

applicable" legal principle. First, they argue that, under the principle set forth in Garrity v Lyle

Stuart, Inc. (40 NY2d 354, 356 [1976]), the arbitrators were prohibited from awarding punitive

damages under New York law. However, under the FAA, which controls here, punitive

damages are an available remedy (see Mastrobuono v Shearson Lehman Hutton, Inc., 514 US

52, 59 [1995]). In Mastrobuono, the Supreme Court permitted punitive damages in an

arbitration award, despite the fact that a provision in the underlying agreement contained a New

York choice of law clause, and that certain cases under New York law prohibit the award of

punitive damages by arbitrators (id. at 59-62). Important to the Court's decision was that the

underlying agreement contained a broad arbitration clause, in which the parties agreed to

mandatory arbitration of all disputes under the rules of the National Association of Securities

20

Dealers (NASD) which, like the AAA rules, have been held to permit arbitrators to award

punitive damages (id. at 58-61). Thus, the Supreme Court reasoned, the parties' agreement

contemplated an award of punitive damages (id. at 61). Specifically, the Supreme Court held

that "if contracting parties agree to include claims for punitive damages within the issues to be

arbitrated, the FAA ensures that their agreement will be enforced according to its terms even if a

rule of state law would otherwise exclude such claims from arbitration" (id. at 58). In other

words, punitive damages were allowed because the FAA preempted New York's Garrity rule

prohibiting such an award (id. at 60-62).

Indeed, as the First Department has already recognized: "[T]he decision of the

Supreme Court in Mastrobuono makes it unmistakably clear that, with respect to arbitration

proceedings governed by the FAA which preempts the Garrity rule, the arbitration of punitive

damage claims is required except where the parties have unequivocally agreed otherwise"

(Mulder v Donaldson, Lufkin & Jenrette, 224 AD2d 125, 130 [1st Dept 1996]). This court has

also previously noted the Supreme Court's holding that "an arbitration proceeding governed by

the Federal Arbitration Act . . . preempts the Garrity rule, even when there is a New York choice

of law clause in the arbitration agreement" (Prudential Securities Inc. v Pesce, 168 Misc 2d 699,

703 [Sup Ct, NY County 1996]). Accordingly, "[t]his court is bound to apply Mastrobuono and

the issue of punitive damages is left to the arbitrators to decide" (id. at 703-04; see also Von

Steen v Musch, 3 Misc 3d 207, 214 [Sup Ct, NY County 2004] [punitive damages claim

allowable in FAA-governed arbitration heard before the AAA]).

The language in the choice-of-law and arbitration provisions in the Partnership

Agreement is nearly identical to the language in the underlying agreement in Mastrobuono. The

relevant provisions of the agreement in Mastrobuono provided, first, that the agreement "shall be

21

governed by the laws of the State of New York," and second, that "any controversy" arising out

of the transactions between the parties "shall be settled by arbitration" in accordance with the

rules of the NASD (514 US at 58-59). Similarly, the Partnership Agreement provides, first, that

it "shall be construed under the laws of the State of New York," and second, that "[a]ny

controversy or claim arising out of or concerning this Agreement or the performance thereof or

arising out of or concerning the management of the business of the Partnership shall be settled

by arbitration in accordance with the rule of the [AAA], except that the Arbitrator(s) shall not

have the power to reform this Agreement" (Partnership Agreement, §§ 9.09-9.10, at 49-50

[Stryker Aff., Exh EE]).

Moreover, the language in the rules of the NASD and in the rules of the AAA is

also very similar (compare NASD Code of Arbitration Procedure 3741 (e) [providing that

arbitrators may award "damages and other relief"] with AAA Rule 43 (a) ["The Arbitrator may

grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the

agreement of the parties, including, but not limited to, specific performance of a contract"]).

It is therefore clear that punitive damages are an appropriate and available

remedy, and that, thus, defendants have failed to demonstrate that their proposed rule of law –

that punitive damages are unavailable under New York law – is "well defined, explicit, and

clearly applicable."

Defendants also argue that the Panel exceeded its powers by trying to reward the

non-party individual plaintiffs with the proceeds of the punitive damages award (Award, at 9

["the deplorable and reprehensible conduct of Myron Kaplan and Barbara Kaplan justified an

Award of punitive damages against them for the benefit of the Claimants"]). Defendants argue

that such an award cannot stand in a derivative action, where the claims belong to the

partnership, not to those who initiate the derivative action.

Contrary to defendants' argument, punitive damages in derivative suits are not available solely to the derivative entity, and may be awarded directly to shareholders of the entity or other non-parties: "[T]here is ample precedent for distributing damages won in a derivative suit directly to deserving shareholders" (General Elec. Co., p.l.c. v Bucyrus-Erie Co., 563 F Supp 970, 974 [SDNY 1983] [derivative standing of plaintiff corporate shareholders not undermined by prayer for money damages for themselves and not for corporation whose shares were held]; accord Kalin v Zamboo, Inc., 2007 WL 273546, *1, * 13 [SDNY 2007]; see generally Perlman v Feldmann, 219 F2d 173, 178 [2d Cir 1955] [defendant majority shareholder accountable to minority shareholder plaintiffs, who were "entitled to a recovery in their own right, instead of in right of the corporation (as in the usual derivative actions)"]; Miller v Steinbach, 268 F Supp 255, 268-69 [SDNY 1967] [in shareholder derivative suit on behalf of merged corporation, recovery could go directly to shareholders of merged corporation]).

Indeed, there were good reasons here to apportion the punitive damages award to the plaintiffs rather than to the limited partnership. Plaintiffs collectively undertook the financing of this litigation, spending over $1,000,000 plus expenses to bring the case (see Bogner Aff., ¶ 11). Specifically, they organized, retained counsel, attended the Arbitration, and gave testimony (id.). Moreover, none of them were relatives of the Kaplans or of Nathan, though many of the other limited partners in the Partnership were (id.).

Although defendants rely heavily on the Court of Appeals' decision in Glenn v Hoteltron Sys., Inc. (74 NY2d 386 [1989]), the Court there specifically held that "we do not rule out the possibility that an award to innocent shareholders rather than to the corporation would be appropriate in some circumstances" (id. at 393). Here, it is appropriate to award damages to the

plaintiffs rather than the Partnership, as the Panel did, since Myron Kaplan is the general partner while plaintiffs are limited partners. The Partnership Agreement grants the general partner much power over, and a large share of, the assets of the Partnership. In view of the nature of the Award against Myron Kaplan, it would not be appropriate to grant him substantial power over the Award. One does not generally put the fox in charge of the chicken coop.

Furthermore, defendants rely exclusively on New York law, which is inapposite here, since the FAA controls. Defendants are judicially estopped from adopting the inconsistent position that, with respect to punitive damages, state law should control, since it was at Myron Kaplan's insistence that the FAA was ruled to govern the case (Bogner Aff., Exhs B, C; see Maas v Cornell Univ., 253 AD2d 1, 5 [3d Dept 1997], affd 94 NY2d 87 [1999] [plaintiff judicially estopped from assuming position inconsistent with earlier position "strenuously" adopted"]).

Defendants also argue that an award of punitive damages violates New York public policy. The standard has been that punitive damages are "available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as gross and morally reprehensible, and of such wanton dishonesty as to imply a criminal indifference to civil obligations" (Bernstein v Kelso & Co., Inc., 231 AD2d 314, 324 [1st Dept 1997] [internal citations and quotations omitted]).

While defendants do not dispute the well-established principle that punitive damages are warranted where a fiduciary has willfully committed an egregious fraud on its clients (see id.; see also Indosuez v Barclays Bank PLC, 181 AD2d 447 [1st Dept 1992]), they instead engage in a lengthy analysis contending that the Panel "misinterpreted" the evidence to find that defendants engaged in immoral and reprehensible conduct. Taking into consideration

24

the evidence submitted, the Panel found that the standard for awarding punitive damages had

been met. Clearly, the Panel was correct in its findings. The court notes that, in recent years,

many actions, both civil and criminal, have been commenced against directors, officers or others

in control of public companies, for their improper conduct. Punitive damages are appropriate to

deter defendants and others like them from engaging in conduct that may be characterized as

wanton dishonesty and morally reprehensible. The Panel did not err in reaching its decision that

punitive damages should be awarded in this case. However, irrespective of the fact that this

court agrees with the Panel's decision, manifest disregard of the evidence is not a cognizable

ground for vacatur, as previously discussed.

### 5.    Attorneys' Fees

Defendants argue that the Panel manifestly disregarded the law by awarding

plaintiffs attorneys' fees. Defendants again fail to meet the first prong because they do not even

claim to have brought this legal principle to the Panel's attention. Defendants also fail to

identify a "well defined, explicit and clearly applicable" legal principle. The Partnership

Agreement explicitly provides that AAA rules govern this dispute, and AAA Rule 43 (d) (ii)

states that "[t]he award of the arbitrator(s) may include . . . an award of attorneys' fees if all

parties have requested such an award or it is authorized by law or their arbitration agreement"

(Rule 43 [d] [Stryker Aff., Exh XXXXX]). All parties to the Arbitration made such a request

(see Stryker Aff., Exhs Y, Z, AA, BB, CC). These requests were explicitly verified by the Panel

during the Arbitration when the Chairman stated:

> [A]ll parties previously stipulated that we have the right to
> adjudicate the issues of legal fees and at the end, it's likely that
> we'll be taking an affidavit of services and then we'll make an
> adjudication . . . If you check the AAA rules, 43 (c) maybe . . .
> you'll see that there's a specific rule that says that, regardless of

anything else, since everyone has agreed that we're adjudicating legal fees, we have the authority to do that.

JN Tr 3835:21-3836:23 (Stryker Aff., Exh A). During the Arbitration, defendants did not object to, or otherwise contest, the Panel's interpretation of the AAA rules; instead, they submitted their applications for fees, and challenged plaintiffs' application on the merits. Thus, the Panel did not err in awarding attorneys' fees.

Moreover, both New York and federal law permit arbitrators to award attorneys' fees (see, e.g., Yalowitz v Prudential Equity Group LLC, 25 AD3d 354, 355 [1st Dept], lv denied 6 NY3d 710 [2006] [arbitrators' award of attorneys' fees was not in manifest disregard of the law]; InterChem Asia 2000 Pte. Ltd. v Oceana Petrochemicals AG, 373 F Supp 2d at 354-55 [affirming award of attorneys' fees in case governed by FAA and AAA arbitration rules]; Spector v Torenberg, 852 F Supp 201, 210-11 [SDNY 1994]).

Accordingly, defendants have not demonstrated that there is a "well defined, explicit, and clearly applicable" legal principle that the Panel violated in this section of the Award.

### 6.    Forfeiture of Compensation for the Years 1991-1999

Defendants argue that the Panel manifestly disregarded New York law that disgorgement is only available for the period of disloyalty. Thus, they argue, as there is no claim by plaintiffs that Myron Kaplan benefitted from any same-day, same-security trading after Barbara Kaplan's April 16, 1999 departure from CIBC, that portion of the disgorgement award directing forfeiture of allocations to Myron Kaplan's capital accounts from April 17, 1999 to December 31, 2004 must be vacated.

However, defendants' argument is based on a claim of factual error by the Panel.

26

Thus, defendants are really arguing that the Panel manifestly disregarded the evidence, which, as

previously discussed, is an improper ground for vacatur. In any event, this argument is

completely incorrect. Using a chart based on plaintiffs' expert's report on damages, defendants

calculate the performance fee plus interest paid to Myron Kaplan for the years 2000-2004 and

part of 1999, and then argue that since his disloyalty ended in 1999 with the departure of Barbara

Kaplan from CIBC, the disgorgement remedy must be reduced by this amount – $9,318,500.00.

However, an examination of the expert's report shows that by adding the entries for Myron

Kaplan's performance fee plus interest only for the years 1991-1999 yields $35,041,141.00,

which is the exact amount that the Panel ordered Myron Kaplan to disgorge (Award, at 9). In

other words, the Panel did not award disgorgement for the 2000-2004 period about which

defendants currently complain.

**The Panel Did Not Exceed Its Authority in Rendering the Award**

Defendants also argue that vacatur is warranted on the ground that the Panel

"exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award

upon the subject matter was not made" (9 USC § 10 [a] [4]).

"[V]acatur based on an arbitrator's having exceeded his powers is rare"

(InterChem Asia 2000 Pte. Ltd. v Oceana Petrochemicals AG, 373 F Supp 2d at 352). Indeed,

this ground for vacatur has been "'consistently accorded the narrowest of readings . . . especially

. . . in the context of arbitrators' alleged failure to correctly decide a question which all concede

to have been properly submitted in the first instance'" (Westerbeke Corp. v Daihatsu Motor Co.

Ltd., 304 F 3d at 220, quoting Matter of Andros Compania Maritima, S.A. [Marc Rich & Co.,

A.G.], 579 F2d 691, 703 [2d Cir 1978]).

The court's inquiry into whether an arbitration panel has exceeded its authority

27

under Section 10 (a) (4) first "focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided the issue" (InterDigital Comm. Corp. v Nokia Corp., 407 F Supp 3d at 528 n3, quoting DiRussa v Dean Witter Reynolds Inc., 121 F3d at 824). "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the Court must confirm the award, even if "convinced [the arbitrators] committed serious error" (InterChem Asia 2000 Pte. Ltd. v Oceana Petrochemicals AG, 373 F Supp 2d at 353 [citation omitted]; see also Moses H. Cone Memorial Hosp. v Mercury Constr. Corp., 460 US 1, 24-25 [1983] ["any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense or arbitrability"]).

Notably, the scope of the arbitrators' authority is defined not just by the agreement, but also by the parties' conduct in submitting the dispute to arbitration. The First Department has determined that "having participated in the arbitration process, [a party] cannot now contest the authority of the arbitrator to determine the very issues submitted" (Merrill Lynch Pierce, Fenner & Smith Inc. v Chan, 38 AD3d 355, 356 [1st Dept 2007]). This has been held true even in situations where the relevant contract does not grant the arbitrators specific authority to hear certain issues. The parties, by their conduct, are held to have waived later objection to the arbitrators' adjudications of those issues "by voluntarily submitting the issue to arbitrators, vigorously debating it before them, and then completely failing during the proceedings to challenge [the arbitrators'] authority to decide the issue or otherwise preserving it for judicial resolution" (Matter of Engel (Refco, Inc.), 193 Misc 2d 91, 100 [Sup Ct, NY County 2002]).

28

Second, the exceeding authority standard focuses on whether "the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract" (Westerbeke Corp. v Daihatsu Motor Co. Ltd. 304 F 3d at 222 [party opposing confirmation was unable to point "to any express provisions" of the agreement that "foreclose the result reached by the arbitrator"]). If the arbitrator is merely "interpret[ing] an arguably ambiguous contractual provision in light of the intent of the parties" and not administering "his own brand of justice in contradiction of the clearly expressed language of the contract," then the argument that the arbitrator exceeded his authority must fail (Local 1199, Drug, Hosp. and Health Care Employees Union, RWDSU, AFL-CIO v Brooks Drug Co., 956 F2d 22, 26-27 [2d Cir 1992]).

The arbitrators have broad latitude in interpreting the scope of their authority under the arbitral contract, including interpretation of terms of the contract, and these interpretations are "accorded substantial deference" by courts (Roffler v Spear, Leeds & Kellogg, 13 AD3d at 310; see, e.g., Westerbeke Corp. v Daihatsu Motor Co. Ltd., 304 F3d at 214 ["The arbitrator's factual findings and contractual interpretation are not subject to judicial challenge"]; Yusuf Ahmed Alghanim & Song v Toys "R" Us, Inc., 126 F3d 15, 25 [2d Cir 1997], cert denied 522 US 1111 [1998] ["Interpretation of . . . contract terms is within the province of the arbitrator and will not be overruled simply because we disagree with that interpretation"]).

Applying these standards, the scope of the Partnership Agreement and the subsequent submissions by the parties were clearly broad enough to allow the Panel to decide all issues, and grant all remedies set forth in the Award. First, there is no question that the plain language of the Partnership Agreement makes clear that "any controversy or claim arising out of

29

or concerning this Agreement or the performance thereof or arising out of or concerning the management of the business of the Partnership shall be settled by arbitration" (Partnership Agreement, § 9.10). In conjunction with the applicable AAA Rule that gives arbitrators broad authority to "grant any remedy or relief that the arbitrator deems just and equitable" (Rule 43 [a]), the Partnership Agreement thus vested the Panel with broad authority to decide all claims having some connection to the Agreement, which the instant claims for fraud and breach of fiduciary duty clearly do.

Moreover, the parties' conduct in conducting the arbitration demonstrates that all relief requested by plaintiffs was understood to be subject to resolution by the Panel. Plaintiffs' prayer for relief in the original complaint is almost identical to the relief requested in their later Statement of Claim in the Arbitration, including prayers for punitive damage, disgorgement of all compensation paid to defendants, and joint and several liability (Complaint, at 27-28; Statement of Claim, at 37-38). In response to the original complaint, Myron Kaplan successfully moved this court to compel the arbitration of these claims, arguing that if "all or some of the claims" were not barred by the relevant statutes of limitations, the court should immediately compel the arbitration of those remaining claims (Bogner Aff., Exh B, at 2). Based upon Myron Kaplan's own prior submissions to this court, it is obvious that the parties submitted all issues to the Panel, and that defendants "real objection appears to be that the arbitrators committed an obvious legal error" in rendering the Award (DiRussa v Dean Witter Reynolds Inc., 121 F3d at 824). "Section 10 (a) (4) was not intended to apply to such a situation" (id.).

Further, defendants argued the merits of every claim placed before the Panel, and mounted vigorous defenses against every claim brought against them, thereby waiving any argument that the Panel exceeded its authority in deciding these claims (see Matter of Shannon

30

(Liberty Mut. Ins. Co.), 236 AD2d 231, 232 [1ˢᵗ Dept 1997] ["Respondent, having participated in the arbitration process, cannot now contest the authority of the arbitrator to determine the very issue submitted"]).

Defendants also cannot show that the Panel "so far depart[ed] from the terms of the agreement that it is not even arguably derived from the contract" (Westerbeke Corp. v Daihatsu Motor Co. Ltd., 304 F3d at 222]). Acting well within its broad authority, the Panel interpreted the Partnership Agreement according to its terms. Defendants have not shown that the Panel violated any clear and unambiguous terms of the contract.

For example, defendants' argument that the Panel "reformed" the contract in ordering disgorgement rests on the narrow terms of three isolated sections of the Partnership Agreement, and fails to consider the entirety of the contract. Moreover, even the isolated sections discussed by defendants fail to address the appropriate remedy in the event that a general partner commits fraud or breaches his fiduciary duty. The Panel thus acted well within its authority in interpreting the contract to incorporate the general principles of law applicable to fiduciaries, which unquestionably authorize disgorgement. Indeed, the overwhelming weight of the evidence shows that the Panel's factual findings of fraud and interpretations of the Partnership Agreement are well within the bounds of the reasonable.

Accordingly, since defendants cannot point to "express provisions" of the Partnership Agreement that, read in context, "foreclose the result reached by the arbitrator" (Westerbeke Corp. v Daihatsu Motor Co. Ltd., 304 F3d at 222), their argument that the Panel exceeded its authority must fail, and the Award must be confirmed.

In conclusion, the findings and orders detailed in the Award are clear and definite; they were decided after the Panel engaged in intensive fact finding and careful consideration of

31

Case 1:07-cv-06668    Document 6-6    Filed 12/21/2007    Page 33 of 33

the variety of mixed questions of fact and law that were presented by the parties. Accordingly, plaintiffs' motion to confirm the Award (Motion Sequence No. 015) is granted, and the Award is confirmed. In light of this determination, plaintiffs' motions for pre-judgment attachments of the assets of defendant Myron and Barbara Kaplan (Motion Sequence Nos. 014 and 016) are denied as moot. In addition, the temporary restraining orders entered by this court prohibiting Myron and Barbara Kaplan from transferring such assets are continued, until further order by this court.

The court has considered the remaining arguments, and finds them to be without merit.

Accordingly, it is

ORDERED that the motion to confirm the arbitration award (Motion Sequence No. 015) is granted, and the award rendered in favor of plaintiffs and against defendants is confirmed; and it is further

ORDERED that the motion for pre-judgment attachment of the assets of defendant Myron Kaplan (Motion Sequence No. 014) is denied as moot; and it is further

ORDERED that the motion for pre-judgment attachment of the assets of defendant Barbara Kaplan (Motion Sequence No. 016) is denied as moot; and it is further

ORDERED that the temporary restraining orders entered by this court against the assets of Myron and Barbara Kaplan, prohibiting them from transferring such assets, shall continue in effect until the further order of the court.

Dated: July 18, 2007                          ENTER:



_____/s/_____
J.S.C.